May it please the Court. Well, let's wait until the counsel sits down. May it please the Court. Lewis Gordon of Carlin & Carlin for the petitioner. I'd like to reserve three minutes for rebuttal. Counsel, did your client get a stay at deportation? From the Board of Immigration Appeals or from Title Police? Has he been sent home? No. My understanding is he's here, that he has not received a notice to report. When did you talk to him last? It's my co-counsel who wrote the brief that spoke to him, and I can't answer that. When he last spoke to him. But my understanding is. Is he aware of this argument this morning? I believe so. Okay. Why did this case take, it's been better than two years, I think, since the appeal was filed. Why is it taking so long for the Immigration Bar to get these cases briefed and here in court? Can you tell me? There's, it seems to be, there's a long, there's so many cases pending before your court now. Is it a case of deliberate delay? No. I mean, I think there's something like three or four petitions on your behalf, on behalf of your client, to extend the briefing time. Is this standard practice for immigration lawyers now? No, that's not my understanding, but. But what's the problem? I mean, is he getting the record from the INS or? Well, that's been a problem in a number of cases. Is it a problem in this case? I'm not aware, nor am I prepared to actually argue one. Okay. So as I understand it, then the government is free at this point in time to send your client home while the decision is being written. Is that correct? That's my understanding. Okay. Is it malpractice not to ask for a stay? Is it malpractice not to ask for a stay? Do you have an agreement with the government that's not a record or something? No, Your Honor. So it's just a crapshoot. If the government catches up with him, he's gone, right? Well, we can file an emergency stay where they do issue him a bag and baggage letter. The procedure is usually they call him in and they give him a period of time. Okay. Is there a – well, I'll ask counsel for the government. I thought that in some of these situations the government granted a stay, but I'm not sure. Well, there was no stay granted from the Board of Immigration Appeals. Yeah. But, Your Honor, I would like to address the factual issue on the case or the issue before you in that the petitioner is trying to get his case reopened by the Board of Immigration Appeals so he can have his asylum case heard, and he's never had a hearing on that case. He did file the motion to reopen. He did include some articles about the political situation in Singapore. Well, what changed between the completion of the last round of BIA review and his motion to reopen? I read the New York Times article and the country condition report, but in all candor, I can't see what it is that's different today that was known to him at the time. I guess my question is why didn't he prosecute his asylum claim at that point? Well, it was a standard procedure in immigration court in that era, particularly during the fall of 1996 to withdraw your asylum to go forward on a suspension of deportation case. In the record, the immigration judge has said he's not thrilled about the new law, but he felt he had to apply it under the circumstances. So my client, like a number of other people, was kind of caught in that situation of thinking that the suspension would go forward at some point in time and didn't then go forward on his asylum case. He — the country conditions in Singapore have not improved. The State Department report in the New York Times article, I think, show that they certainly haven't improved. Combined with what he had undergone and has not had a hearing on, he has asked that his case be reopened. And we think that in light of that and in light of the fact that he's never had a hearing on his case, he should be allowed to have that hearing, that the case should be reopened. Now, has he been before the — this Court before in number 0171202? Yes. So how long has he stayed in the United States now without documentation? I believe that decision was in 2001. When did he first get here? He first arrived in 1989. So he's been here about 13, 14 years? Yes, Your Honor. Okay. So that's the basic issue. I mean, he was a member of the Singapore Democratic Party. What work does he do here? What work does he do here? I'm not aware of that, Your Honor. What? I'm not aware of what he's currently — what his current employment is. Does he have children? I believe he does, and I believe his family is in Singapore. And given what had happened to him, that he had been tortured, given the fact that the political situation has not changed, his party is in the opposition, and it is basically a one-party government in Singapore, we're asking that the case be sent back to the Board of Immigration Appeals and reopened. All right. Thank you. May it please the Court, my name is Jeffrey Bernstein, and I represent the government. I guess I have two things to say in response. The first is the regulations regarding reopening require the submission of evidence which was previously unavailable. I mean, it's like a Rule 59 motion in a district court. And it is clear that no new evidence, no new material evidence was submitted. Mr. Singh was apparently relying mostly on allegations that he had made before but hadn't withdrawn. That's not new evidence. And the — Well, we entered a summary affirmation in the first case. Why wasn't that enough? Why wasn't that enough for what, Your Honor? To deport. He filed his motion to reopen. Sir, this is the reopened proceeding? That's correct. You are reviewing the order of the Board of Immigration Appeals denying his motion for — to reopen deportation proceedings. That's what was here before, wasn't it? No. What was here before was the Board's order denying his motion for his — excuse me, his application for suspension of deportation. Okay. Those aren't even appealable anymore, are they? Not anymore, Your Honor. What are we doing here today? He — this Court has jurisdiction to review the Board's decision denying his motion to reopen, to file an asylum claim, which he had withdrawn a number of years ago. In 1989, he came to this country. I want to talk for just a second, and I think I'm answering your question as I go, Your Honor. And if I'm not, please interrupt again. I guess I don't have to request that. We're pretty good at that. Counsel was talking about some standard procedure regarding the abandonment of apparently what he believes to be a valid asylum claim. I know of no such procedure. The procedure I know of is the procedure by which aliens who are deportable and have no access to any other kind of relief tend to file asylum applications or tended to file asylum applications in order to stay in the country long enough in the hopes that the administrative process would take so long so that they could obtain 7 years and get — get suspension, an opportunity for suspension of deportation. And when, as in this case, the 7 years were accrued, generally the applicants abandon their asylum applications and proceed on their applications for suspension of deportation. Here, there was kind of a hair in the ointment, so to speak, because the government at the time, his hearing — You're putting a fly in the ointment. Yes, a fly in the ointment, Your Honor. I'm sorry. Hair in the ointment is totally different. The fly in the ointment was that there was a statute passed which provided — it's the stop time rule which the Court has dealt with, which provides that when deportation proceedings are commenced, the time for accrual of residents in the United States for purposes of suspension is told and it stops. So at the administrative hearing — and I think this is very telling — at the administrative hearing, the only opportunity that Mr. Singh had to obtain suspension of deportation was in the hopes that this Court would find the stop time rule impermissibly retroactive, which it didn't. So he had so little faith in his asylum application and he had so — so much fear, apparently, of being cross-examined by the government with respect to his allegations or the Board of Immigration Appeals examining his claim that he simply abandoned the claim and rested his hopes solely on a — on a chance that this Court might find that the new law was impermissibly retroactive. So there is no standard procedure, except, I think, the one that I've just described.  And it's just things that aliens used to do before the law was changed. Again, Plaintiff's — Petitioner's counsel has asserted that Mr. Singh has never had a hearing before the administrative bodies regarding his application for asylum. Well, he withdrew his application. Kennedy. Are we talking I.J. or B.I.A.? I.J. and B.I.A., Your Honor. Either one. Either one. He withdrew. He withdrew before the immigration judge. And when he withdrew before — before the immigration judge, he withdrew his claim. It was as if a claim had never been filed. And so when he appealed to the B.I.A., the asylum application was out of the picture. He was just talking about suspension of deportation. Now, again, going back to my initial point, the regulation — let me just backtrack for a second. This — this motion to reopen was also untimely. The Board didn't apply their timeliness regulations, but it was also untimely. But, again, the regulations require, as a matter of regulatory law, and no one has ever challenged the efficacy of this requirement, that in order to succeed on a motion to reopen, to reapply for asylum, one must show — one must produce evidence which was not available at the time of the original proceeding here when the — when the Petitioner withdrew his asylum application. The only new evidence is the New York Times article and the — I believe it's the Amnesty International article. And as the B.I.A. concluded, this new evidence clearly does not support the condition — the assertion in the motion to reopen that conditions in Singapore had worsened rather the evidence establishes that while the government might engage in hard-nosed politics, clearly hard-nosed, the hardest-nosed politics I've ever seen, it does not persecute its political opponents. It simply, as the articles point out and the report points out, it doesn't have to. It's been in power for 45 or so years, and it has consistently been reelected. The — Do these parties represent basically different ethnic groups? Not that I'm aware of, Your Honor. I don't think my recollection — You've been to Singapore? I've never been to Singapore, Your Honor. I've been to Singapore. In Singapore, you have a very large ethnic Chinese population, and you have a very large ethnic East Indian population. So I'm just wondering if these parties represent those various groups. I'm not aware that that's the case, and I couldn't say that that's not the case either, Your Honor. I simply — I simply don't know. The only instances of record which are noted in the reports of action against political opponents are three instances of punishments for speaking or writing without prior permit. Now, these individuals, there were three of them, they were jailed for an extremely short period of time, and they were jailed only because they refused to pay fines. And after they were jailed, the fines were later reduced, and these political opponents were thus free to run for office. So this is not the sign of a government that ruthlessly beats and tortures its opponents. And indeed, the New York Times article and the other report recited the history of the country, and such history does not indicate that they were behaving in a harsh manner towards political opponents, persecutive manner towards political opponents, even back in 1989 when Mr. Singh left the country. Well, they do have very harsh criminal laws. They do. That's correct, Your Honor. They beat everybody. They even sell T-shirts. Yes. I've been caned. They tell you how many, you know, all the penalties for throwing a piece of paper on the street, you know. They do, Your Honor. But criminal, you know, prosecution and punishment for criminal acts is not persecution. I mean, people in France — It's funny I know that. I'm just saying it's a —  People in France would think that, you know, that we persecute people by applying the death penalty. It's a tough place. Yes, it is a tough place. Again, people in France would think the United States is a tough place because we put people to death. And — What did you say? People in France would think this is a tough country because we have the death penalty. They don't, and they refuse to extradite people back here. We're not paying too much attention to them anyway. Well, we renamed our prize Freedom Prize. So in sum, he abandoned his asylum application. He didn't produce any new material evidence which would support his assertion that changed country — that country conditions had changed for the worse in Singapore. The Board clearly did not abuse its discretion in denying the motion to reopen, and that's the standard. Is there a stay pending? Not that — I'm not aware that there is a stay, and I'm not aware that there is not a stay. To be honest with you, Your Honor, and this is no excuse, I just picked this case up a few days ago, and I wasn't concentrating. I — my — the portions of the file that I have would not reflect whether or not an application for a stay was made, although I believe counsel indicated that he did not believe that an application for a stay. But in any event, I'm not aware that Mr. Singh has been removed. He may have been, but I'm certainly not aware that he has. All right. Again, the Board did not abuse its discretion in denying the motion to reopen, and that's — that's clear, I think, as a matter of law. Mr. Singh, in his papers and in his arguments before the Court, doesn't even argue the efficacy of the motion to reopen. He's more concentrating on the asylum aspect. I — my personal belief in those circumstances, summary affirmance is — is in order. But certainly, if you don't summarily affirm, you should — you should issue a decision affirming the Board's denial of the motion to reopen. All right.  Thank you, Your Honor. Our position is that Mr. Singh submitted enough evidence to make the prima facie showing, particularly when combined with his previous application. Counsel's assertion that — Prima facie showing of entitlement to asylum? No. Entitlement to a hearing. But that's not the standard. The standard is, did the Board of Immigration Appeals abuse its discretion in denying his motion to reopen? And we look to whether or not he alleged evidence that was new and not available to him at the time that he withdrew the prior application. Isn't that the law that we apply to judge — Yes. Yes. But he does have two articles that were not available. By your own admission, the articles show basically that the conditions have remained the same. So how is that new evidence? Well, it's new evidence of existing facts. I mean — It's essentially saying the situation is status quo ante, the same situation that existed at the time he withdrew his application for asylum. So what's new? What's new is that there is continuing political problems in the country. He did — I have a different understanding, I guess, of what the law requires you to show. To me, that doesn't seem like it's enough to justify him not going forward earlier when he had previously moved or petitioned for asylum. I understand that, Your Honor. But given the facts situation, and counsel and I have different interpretations on the procedure in the immigration court, but given that situation, I believe he — that was the procedure at the time. It's to say that he was fearing the board of cross-examining him. That's not in the record. That's pure speculation. But I ask that you re-manage the BIA to reopen. Thank you. Thank you, counsel. All right. Thank you. Matters stand submitted. And we'll now come to the next two matters. Garcia and Trouts, they're submitted. And Fidelity Federal Bank v. Dergamma Corporation is up next. Thank you.
judges: Pregerson, Beezer, Tallman